IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

STATE OF FLORIDA

   Plaintiff,          JURY TRIAL DEMANDED

v.                Case No.:

TYCO FIRE PRODUCTS LP;
CHEMGUARD, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
NATIONAL FOAM, INC.;
KIDDE-FENWAL, INC.;
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS & COMPANY;
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC;
CORTEVA, INC.;
DUPONT DE NEMOURS, INC.;
UTC FIRE & SECURITY AMERICAS
CORPORATION, INC.; and
CARRIER GLOBAL CORPORATION.

   Defendants.

_____/

## **COMPLAINT**

   Plaintiff State of Florida ("the State" or "Florida"), by and through its attorney, Ashley

Moody, Attorney General for the State of Florida, brings this action against Tyco Fire Products

LP; Chemguard, Inc.; Buckeye Fire Equipment Company; National Foam, Inc.; Kidde-Fenwal,

Inc.; Dynax Corporation; E.I. du Pont de Nemours & Company; The Chemours Company; The

Chemours Company FC, LLC; Corteva, Inc.; DuPont de Nemours, Inc.; UTC Fire & Security

Americas Corporation, Inc.; and Carrier Global Corporation, and alleges as follows:

## NATURE OF THIS ACTION

1.     This action arises from threats to public health and contamination in the environment caused by Defendants' manufacturing and distribution of Aqueous Film Forming Foam ("AFFF") and components thereof.

2.     AFFF is a product that has been used to extinguish fires involving fuel or other flammable liquids including aviation fires and fires in industrial facilities with automatic fire suppression systems. AFFF products are also used to train firefighters and test firefighting equipment. AFFF products contained the chemical compounds perfluorooctanoic acid/perfluorooctanoate ("PFOA"), perfluorooctane sulfonic acid/perfluorooctane sulfonate ("PFOS"), and/or chemical compounds that transform into PFOA and/or PFOS (collectively, "PFOA/S").

3.     Human exposure to PFOA is associated with an increased risk of kidney and testicular cancer, ulcerative colitis, and other conditions. Human exposure to PFOA and PFOS is associated with an increased risk of immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, and other adverse health conditions.

4.     Defendants designed, manufactured, marketed, and sold PFOA/S and/or AFFF containing PFOA/S that were discharged into the environment at or from sites throughout Florida.

5.     The State brings this action for: (1) compensatory damages consisting of (i) costs incurred and to be incurred by the State in investigating, monitoring, remediating, and otherwise responding to injuries and/or threats to public health and the environment caused by Defendants' products; and (ii) damages for harm to the State's natural resources; and (2) injunctive and equitable relief in the form of a monetary relief for the State's reasonably expected future

damages, and/or requiring defendants to perform investigative and remedial work in response to the threats and injuries they have caused.

**PARTIES**

6. Florida is a sovereign state with a population of over twenty million. The State brings this action as *parens patriae* and as representative of all residents and citizens of the State, as trustee and guardian of the State's natural resources, and on its own behalf in its proprietary capacity.

7. Defendant Tyco Fire Products, LP ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware, having its principal place of business at One Stanton Street, Marinette, Wisconsin. Tyco does business throughout the United States, including conducting business in Florida.

8. Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). At all times material hereto, Tyco/Ansul designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

9. Defendant Chemguard Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard does business throughout the United States, including conducting business in Florida. At all times material hereto, Chemguard designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

10. Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized and existing under the laws of the state of Ohio, with its principal place of business at

3

110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye does business throughout the United States, including conducting business in Florida. At all times relevant, Buckeye Fire designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

11.     Defendant National Foam, Inc., (a/k/a Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501. National Foam is the successor in interest to Angus Fire Armour Corporation, and manufactures the Angus brand of products. National Foam does business throughout the United States, including conducting business in Florida. References to "National Foam" herein shall also refer to AFFF manufactured, marketed and sold under the "Angus" name and "Angus Fire" brand. At all times relevant, National Foam manufactured, designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

12.     Defendant Kidde-Fenwal, Inc. ("Kidde"), is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza, Hartford, Connecticut 06101. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde does business throughout the United States, including conducting business in Florida. At all times material hereto, Kidde designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

13.     Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States, including business in Florida. Its principal place of business is 103 Fairview Park Drive Elmsford, New York, 10523-1544.

14.     In 1991, Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in

4

firefighting foam agents. On information and belief, at all times material hereto, Dynax designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

15. Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC does and/or has done business throughout the United States, including in Florida. At all times material hereto, UTC designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

16. Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier. Upon information and belief, Carrier does and/or has done business throughout the United States, including in Florida.

17. Defendant E.I. du Pont De Nemours & Co. is a Delaware Corporation and does business throughout the United States, including conducting business in Florida. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805. E.I. du Pont De Nemours & Co. designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

18. Defendant The Chemours Company is a Delaware Corporation and conducts business throughout the United States, including conducting business in Florida. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899. The Chemours Company designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

19. The Chemours Company was incorporated as a subsidiary of E.I. du Pont De Nemours & Co. as of April 30, 2015. From that time until July 2015, The Chemours Company was a wholly-owned subsidiary of E.I. du Pont De Nemours & Co. In July, 2015, E.I. Du Pont de

5

Nemours & Co. spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of The Chemours Company stock to E.I. du Pont De Nemours & Co. stockholders, and The Chemours Company has since been an independent, publicly traded company.

20.     Defendant The Chemours Company FC, L.L.C. is a Delaware Corporation and conducts business throughout the United States including conducting business in Florida. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899. The Chemours Company FC, L.L.C. designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

21.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

22.     E.I. du Pont De Nemours & Co. merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. (DowDuPont). E.I. du Pont De Nemours & Co. and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has effected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

23.     Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware. Corteva Inc. does business throughout the United States, including conducting business in Florida. Corteva designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

24. On June 1, 2019, DowDuPont separated its agriculture business through the spinoff of Corteva, Inc.

25. Corteva, Inc. was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

26. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend. Following that distribution, Corteva, Inc. is the direct parent of E. I. du Pont de Nemours & Co. and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

27. Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DuPont de Nemours, Inc. does business throughout the United States, including conducting business in Florida. DuPont de Nemours, Inc. designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

28. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont (New DuPont). New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva, Inc.

29. Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

7

30. Some or all of the AFFF manufactured and sold by the Defendants contained PFOA/S components manufactured and sold by DuPont.

31. Defendants, among other things: (a) designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFOA/S and/or AFFF containing PFOA/S that was released into Florida; (b) acted with actual or constructive knowledge that PFOA/S for use in AFFF and AFFF containing PFOA/S would be released into the State; (c) promoted PFOA/S for use in AFFF, despite the availability of reasonable alternatives and their actual or constructive knowledge that the contamination alleged in this Complaint would be the inevitable result of their conduct.

32. When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

33. Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

## **VENUE**

34. This Court has jurisdiction to hear these common law causes of action.

35. Defendants' conduct alleged herein occurred in or affected more than one judicial circuit in the State.

36.     Venue is proper in the Thirteenth Judicial Circuit for Hillsborough County, Florida because the causes of action arose at least in part in Tampa, Florida; Defendants transacted business in or their products were introduced into the environment in Tampa, Florida; some of the conduct alleged herein occurred in Tampa, Florida.

## FACTUAL ALLEGATIONS

**A.      PFOA/S Generally – Description, Development, and Regulatory History**

> *i.      PFOA/S and the Threats they Pose to Public Health and the Environment*

37.     Per- and poly-fluoroalkyl substances are chemical compounds containing fluorine and carbon atoms. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

38.     The two most widely studied types of these substances are PFOA and PFOS. PFOA, PFOS, and chemical compounds that transform into PFOA and/or PFOS are referred to collectively herein as "PFOA/S."

39.     PFOA/S have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they present serious health risks to humans and animals. Because PFOA/S have these three properties, they pose a significant threat to public health and the environment.

40.     PFOA/S easily dissolve in water, and thus they are mobile and readily spread in the environment. PFOA/S also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

9

41.     PFOA/S are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA/S are thermally, chemically, and biologically stable and they resist degradation due to light, water, chemical, and biological processes.

42.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases up the food chain.

43.     PFOA/S bioaccumulate because they are relatively stable inside an individual organism. Because of this stability, any newly introduced PFOA/S will be added to any PFOA/S already present. In addition to ingestion, PFOA/S can be introduced into humans and other mammals by, among other routes, crossing the placenta from mother to fetus and by passing to infants through breast milk. In humans, PFOA/S remain in the body for years. PFOA/S biomagnify up the food chain, such as when humans eat fish that have ingested PFOA/S.

44.     Exposure to PFOA/S can be toxic and may pose serious health risks to humans and to animals. Human health effects associated with PFOA exposure include kidney and testicular cancer, thyroid disease, high cholesterol, ulcerative colitis, liver damage, and pregnancy-induced hypertension (also known as preeclampsia). Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and  high cholesterol. In laboratory testing on animals, PFOA/S have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

### ii. _Development of AFFF Products_

45.     PFOA/S were developed in the 1940s, using a process called electrochemical fluorination to create carbon-fluorine bonds. It was soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled the development of a myriad of products that resist heat, stains, oil, and water.

46.     Building on these earlier experiments, the first AFFF firefighting foams were developed in the early 1960s. These AFFF products contained PFOS and were developed to suppress flammable liquid fires, which cannot be effectively extinguished with water alone. Later AFFF products contained various formulations of PFOA/S.

47.     AFFF concentrate containing PFOA/S forms a foam when it is mixed with water and ejected from a nozzle. This foam then coats the fire, blocking the supply of oxygen and creating a cooling effect. These effects help extinguish the fire. A film also forms to continue smothering the fire after the foam has dissipated.

48.     Defendants and/or their predecessors designed, distributed, manufactured and/or sold PFOA/S or AFFF containing PFOA/S.

### iii. _Defendants' Knowledge of the Threats Posed to Public Health and the Environment by PFOA and PFOS_

49.     Since at least 1951, DuPont and, on information and belief, later Chemours, designed, manufactured, marketed, and sold products containing PFOA/S, including Teflon and Stainmaster carpet, and more recently PFOA/S as a feedstock for AFFF.

50.     Upon information and belief, for decades DuPont/Chemours knew or should have known that PFOA/S is mobile, persistent, bioaccumulative, biomagnifying, and toxic.

51.     Upon information and belief, DuPont/Chemours concealed from the public and government agencies its knowledge of the risk of harm to the public posed by PFOA/S.

52.     In 1978, DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but did not disclose this to the public or to the United States Environmental Protection Agency ("EPA").

53.     In 1981, DuPont failed to disclose to the public and to the EPA data demonstrating the movement of PFOA from mothers to fetuses across the placenta. It also failed to disclose to the public and to EPA widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility in Washington, West Virginia, where PFOA concentrations exceeded DuPont's own Community Exposure Guideline.

54.     In 1991, DuPont researchers recommended a follow-up study to a study from ten years earlier of employees who might have been exposed to PFOA. The earlier study showed elevated liver enzymes in the blood of DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, DuPont chose not to conduct the follow up study, instead postponing it until after they were sued.

55.     In or around December 2005, pursuant to TSCA, 15 U.S.C. §§ 2607(e) and 2615(a), DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008 publication, for example, DuPont stated that "the weight of the evidence indicates that PFOA

exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues."

56.     DuPont made those statements despite the fact that in 2006, its own Epidemiology Review Board advised the company not to make public statements asserting that PFOA does not pose any risk to health.

57.     On information and belief, all Manufacturers and DuPont/Chemours knew or should have known that, in its intended and common use, AFFF Products and PFOA/S feedstocks would very likely injure or threaten public health and the environment.

58.     On information and belief, this knowledge was accessible to all Manufacturers and to DuPont/Chemours. For example, in 1970, a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS. On information and belief, at least the following defendants are and/or were members of this trade association: Tyco/Ansul, Chemguard, and National Foam/Angus.

59.     Additionally, on information and belief, all Manufacturers and Dupont/Chemours knew or should have known that their AFFF products and feedstocks easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature of the products' chemical composition, and on information and belief the products have long shelf-lives; and tend to bioaccumulate, because information regarding the presence of substances with carbon-fluorine bonds in the blood of the general population was publicly available.

            iv.     *DuPont's Spinoff of Chemours*

60.     In February 2014, DuPont formed Chemours as a wholly-owned subsidiary.

61.     In July 2015, DuPont used Chemours to spin off its "performance chemicals" business line.

13

62.     At the time of the spinoff, the performance chemicals division consisted of DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

63.     Until the spinoff was complete, Chemours was a wholly-owned subsidiary of DuPont. Although Chemours had a separate board, the board was controlled by DuPont employees.

64.     Prior to the spinoff of Chemours, in 2005, DuPont agreed to pay $10.25 million to resolve eight counts brought by the United States Environmental Protection Agency ("EPA") alleging violations of the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA") concerning the toxicity of PFOA/S compounds. At the time, it was the largest such penalty in history.

65.     DuPont also promised to phase out production and use of PFOA/S by 2015.

66.     Also in 2005, DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.

67.     Under the terms of the 2005 class action settlement, DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA/S exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

68.     After 8 years, the C-8 Science Panel found several significant diseases, including cancer, linked to PFOA/S.

69.     Once the spinoff was complete, seven new members of the Chemours board were appointed, for an 8-member board of directors of the new public company.

70.     The new independent board appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

71.     In addition to the transfer of assets, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFOA/S, although the specific details regarding the liabilities that Chemours assumed are set forth in the non-public schedules.

72.     Within the publicly available information about the transfer is the fact that Chemours agreed to indemnify DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from the operation of or conduct of the [Performance Chemicals] Business at any time."

73.     Chemours agreed to indemnify DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (I) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

74.     Chemours agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

75.     Such liabilities were deemed "primarily associated" if DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

76.     Chemours also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement, or Action with respect to Chemours Assumed Environmental Liabilities...."

77.     In addition to the assumption of such liabilities, Chemours also provided broad indemnification to DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

78.     The effect of creation of Chemours was to segregate a large portion of DuPont's environmental liabilities, including liabilities related to its PFOA/S chemicals and products.

79.     The consolidation of DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of DuPont's liability.

80.     As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations, or liquidity."

81.     At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture of PFOA/S compounds and products that contain PFOA/S compounds.

     v. *Evolving Governmental Understanding of the Levels of Acceptably Safe Exposure to PFOA/S*

82.     Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of injury to health or the environment." See Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2607(e).

16

83. On information and belief, Defendants fail to comply with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF products and feedstocks. See TSCA, 15 U.S.C. § 2607(e).

84. In or around 1998, EPA began investigating safety concerns regarding PFOA/S after some limited disclosures by industry participants.

85. Beginning in 2009, EPA issued health advisories about the levels of exposure to PFOA and PFOS in drinking water that it believed were protective of public health. As described on EPA's website, "health advisories are non-enforceable and non-regulatory and provide technical information to states[,] agencies and other health officials on health effects, analytical methodologies, and treatment technologies associated with drinking water contamination." *Drinking Water Health Advisories for PFOA and PFOS: Questions and Answers,* available at https://19january2021snapshot.epa.gov/ground-water-and-drinking-water/drinking-water-health-advisories-pfoa-and-pfos-questions-and-answers_.html (last visited April 6, 2022).

86. The recommendations in EPA's health advisories evolved as EPA learned more about PFOA/S.

87. On January 8, 2009, EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. *See Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, available at https://19january2021snapshot.epa.gov/sites/static/files/2015-09/documents/pfoa-pfos-provisional.pdf, at p.1, n.1 (last visited April 6, 2022).

88. On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA

17

and PFOS, either singly or combined, should not exceed 70 ppt. *See Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS*, 81 Fed. Reg. 33, 250-51.

**B.    The Use of Defendants' Products in Florida**

89.    AFFF either manufactured by Defendants or containing PFOA/S constituents manufactured by Defendants have been used for decades throughout Florida at military installations, civilian airports, industrial facilities, firefighting training centers, and other facilities.

90.    On information and belief, contamination of PFOA/S from AFFF products is commonplace at these sites. On information and belief, natural resources at, adjacent to, connected with, or otherwise related to the sites have also been contaminated with PFOA/S.

91.    On information and belief, Defendants did not provide warnings regarding the public health and environmental hazards associated with discharging their products into the environment. Nor did Defendants provide adequate instructions about how to avoid or mitigate such hazards.

*i.    The Floridan Aquifer System*

92.    PFOA/S readily migrate vertically from unsaturated soils to groundwater and can migrate in other directions in surface water and in plumes underground. These plumes can commingle with plumes from other PFOA/S sources, creating regional impacts to drinking water supplies.

93.    Within Florida, an estimated 90 percent of drinking water is derived from aquifers.

94.    Many portions of Florida's major drinking water aquifers are highly vulnerable to contamination from PFOA/S, including (at least) the unconfined sand-and-gravel aquifer of northwest Florida, the karstic Floridan aquifers in the north and north-central portion of the State,

18

and the unconfined Biscayne aquifer in South Florida. This vulnerability results from the lack of confining layers overlying these portions.

95.     Additionally, PFOA/S contamination within the karstic limestone portion of the aquifer system has the potential to be transported to Florida's major springs such as Wakulla Springs, Manatee Springs, Blue Springs, and Homosassa Springs. PFOA/S contamination at these springs can negatively impact the ecology of these environments.

96.     On information and belief, because of PFOA/S' mobility and persistence and, because of Florida's unique hydrogeology, PFOA/S discharge at a site can harm off-site environments and contaminate off-site drinking sources.

97.     Defendants should be required to fund the State's investigation of, and remediation efforts related to contamination statewide or to perform those activities themselves.

98.     Defendants should be required to compensate the State for all injuries to, destruction of, or loss of the State's natural resources.

        ii.     *Sites Where the State has Incurred Costs*

99.     As precautionary measures and in order to protect public health and Florida's natural resources from potential PFOA/S contamination from AFFF, the State has undertaken, conducted, and/or overseen initial sampling and/or other oversight activities at numerous sites. The Florida Department of Environmental Protection ("FDEP") conducted preliminary tests— called Preliminary Site Assessments ("PSA")—at certain locations in Florida.

100.    The State has incurred costs in connection with investigating and protecting the public from this potential contamination, including costs incurred in connection with conducting PSAs. The State may incur additional costs in connection with PFOA/S contamination at these sites, including costs associated with the State's continuing investigation and possible

remediation efforts. Additionally, the State's continuing investigation may reveal that the State's natural resources have been injured at or around these sites.

101. The following is an illustrative, non-exhaustive list of sites where the State has already incurred costs related to PFOA/S testing or remediation.

**Bonita Springs Fire**

102. Bonita Springs Fire Control and Rescue District Station #4 is a fire department located at 27701 Bonita Grande Dr., Bonita Springs, Florida.

103. FDEP began a PSA at this site on or about April 23, 2019.

104. During this PSA, groundwater concentrations of PFOA/S as high as 0.118 micrograms of PFOA/S per liter of ground water were measured at this site.

105. During this PSA, soil concentrations of PFOA/S as high as 2.9 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Englewood Fire Training Center**

106. Englewood Fire Training Center is a fire training school located at 13400 Haligan Way, Englewood, Florida.

107. FDEP began a PSA at this site on or about April 17, 2019.

108. During this PSA, groundwater concentrations of PFOA/S as high as 0.153 micrograms of PFOA/S per liter of ground water were measured at this site.

109. During this PSA, soil concentrations of PFOA/S as high as 1.2 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Florida State Fire College**

110. Florida State Fire College is a fire training school located at 11655 NW Gainesville Rd., Ocala, Florida.

20

111.    FDEP began a PSA at this site on or about August 15, 2018.

112.    During this PSA, groundwater concentrations of PFOA/S as high as 14.26 micrograms of PFOA/S per liter of ground water were measured at this site.

113.    During this PSA, soil concentrations of PFOA/S as high as 210,000 micrograms of PFOA/S per kilogram of soil were measured at this site.

**City of Hialeah Fire Training Facility**

114.    City of Hialeah Fire Training Facility is a fire training school located at 7590 W. 24th Ave., Hialeah, Florida.

115.    FDEP began a PSA at this site on or about February 13, 2020.

116.    During this PSA, groundwater concentrations of PFOA/S as high as 0.91 micrograms of PFOA/S per liter of ground water were measured at this site.

117.    During this PSA, soil concentrations of PFOA/S as high as 82 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Hillsborough Community College Fire Academy**

118.    Hillsborough Community College Fire Academy is a fire training school located at 5610 E. Columbus Dr., Tampa, Florida.

119.    FDEP began a PSA at this site on or about March 25, 2019.

120.    During this PSA, groundwater concentrations of PFOA/S as high as 1.56 micrograms of PFOA/S per liter of ground water were measured at this site.

121.    During this PSA, soil concentrations of PFOA/S as high as 430 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Indian River State College Fire Academy**

122.  Indian River State College Fire Academy is a fire training school located at 4600 Kirby Loop Rd., Fort Pierce, Florida.

123.  FDEP began a PSA at this site on or about June 5, 2019.

124.  During this PSA, groundwater concentrations of PFOA/S as high as 12.9 micrograms of PFOA/S per liter of ground water were measured at this site.

125.  During this PSA, soil concentrations of PFOA/S as high as 270 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Melbourne Fire Training Facility**

126.  Melbourne Fire Training Facility is a fire training facility located at 1980 Hughes Rd., Melbourne, Florida.

127.  FDEP began a PSA at this site on or about April 8, 2019.

128.  During this PSA, groundwater concentrations of PFOA/S as high as 6.16 micrograms of PFOA/S per liter of ground water were measured at this site.

129.  During this PSA, soil concentrations of PFOA/S as high as 200 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Miami-Dade College Fire Academy**

130.  Miami-Dade College Fire Academy ("Miami-Dade Fire Academy") is a fire training school located at 3180 NW 119th St., Miami-Dade County, Florida.

131.  FDEP began a PSA at this site on or about August 14, 2019.

132.  During this PSA, groundwater concentrations of PFOA/S as high as 1.28 micrograms of PFOA/S per liter of ground water were measured at this site.

**Miami-Dade Fire Rescue**

133.    Miami-Dade Fire Rescue ("Miami-Dade Fire") is a fire department located at 9300 NW 41st Street, Doral, Florida.

134.    FDEP began a PSA at this site on or about December 18, 2019.

135.    During this PSA, groundwater concentrations of PFOA/S as high as 1.28 micrograms of PFOA/S per liter of ground water were measured at this site.

136.    During this PSA, soil concentrations of PFOA/S as high as 89 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Monroe County Fire Academy**

137.    Monroe County Fire Academy is a fire training school located at US-1, Marathon, Florida.

138.    FDEP began a PSA this site on or about September 26, 2019.

139.    During this PSA, groundwater concentrations of PFOA/S as high as 17.2 micrograms of PFOA/S per liter of ground water were measured at this site.

140.    During this PSA, soil concentrations of PFOA/S as high as 1,400 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Palm Beach County Rescue**

141.    Palm Beach County Rescue is a fire department located at 405 Pike Road, West Palm Beach, Florida.

142.    FDEP began a PSA at this site on or about August 15, 2019.

143.    During this PSA, groundwater concentrations of PFOA/S as high as 1.33 micrograms of PFOA/S per liter of ground water were measured at this site.

144. During this PSA, soil concentrations of PFOA/S as high as 750 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Pensacola Fire Department**

145. Pensacola Fire Department is a fire department located at 1 North Q Street, Pensacola, Florida.

146. FDEP began a PSA at this site on or about June 17, 2019.

147. During this PSA, groundwater concentrations of PFOA/S as high as 4.01 micrograms of PFOA/S per liter of ground water were measured at this site.

148. During this PSA, soil concentrations of PFOA/S as high as 21 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Plantation Fire Department**

149. Plantation Fire Department is a fire department located at 8200 Southwest 3rd Street, Plantation, Florida.

150. FDEP began a PSA at this site on or about December 17, 2019.

151. During this PSA, soil concentrations of PFOA/S as high as 20 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Volusia County Fire Training Center**

152. Volusia County Fire Training Center is a fire training school located at 3889 Tiger Bay Road, Daytona Beach, Florida.

153. FDEP began a PSA at this site on or about July 30, 2019.

154. During this PSA, groundwater concentrations of PFOA/S as high as 34.23 micrograms of PFOA/S per liter of ground water were measured at this site.

155.    During this PSA, soil concentrations of PFOA/S as high as 1,400 micrograms of PFOA/S per kilogram of soil were measured at this site.

## COUNT ONE
### Public Nuisance

156.    The State incorporates by reference the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

157.    This is an action against Defendants under Florida common law for damages and abatement of the ongoing public nuisance created by them.

158.    The storage and use of AFFF in Florida has threatened and/or injured drinking water, public health, the environment, property, and the State's natural resources, thus causing a public nuisance.

159.    The State of Florida alleges violations of Florida common law and, acting on its own behalf and on behalf of its residents, seeks monetary relief and abatement of the ongoing public nuisance created by Defendants.

160.    A public nuisance is defined as any annoyance to the community or harm to public health.

161.    Defendants participated in the creation and/or maintenance of this public nuisance through, among other things, their marketing and sale of PFOA/S and AFFF containing PFOA/S with defective designs and without providing adequate product instructions or warnings about the risks to drinking water, public health, the environment, property, and natural resources posed by PFOA/S.

162.    The public nuisance created by the conduct of the Defendants violates rights common to the Florida public; subverts public order, decency, or morals; and causes

25

inconvenience or damage to the public in general. Defendants' conduct has harmed public health in Florida and is an annoyance to Florida communities.

163.    Throughout the State of Florida, Defendants' conduct has affected, and continues to affect, a considerable number of people and entire communities.

164.    Defendants' conduct has injuriously affected public rights, including the right to public health, safety, peace, comfort, and convenience, in communities throughout Florida.

165.    The public nuisance created by Defendants has imposed severe economic costs on the State of Florida, its residents, and its communities. The State of Florida, acting on its own behalf and on behalf of its residents, therefore seeks monetary relief from Defendants.

166.    Defendants are strictly, jointly, and severally liable to the State for all resulting damages, including the costs incurred and to be incurred in responding to the threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources from PFOA/S contamination; damages for the public's lost use of the State's natural resources; the costs of assessing the injury to, destruction of, or loss of those natural resources, including the costs of experts to assess the damage; and property damage.

167.    The State is entitled to an injunction requiring Defendants to abate the public nuisance.

**COUNT TWO**
**Strict Products Liability for Defective Design**

168.    The State incorporates by reference the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

169.    At all times relevant herein, Defendants were engaged in the business of researching, designing, manufacturing, testing, marketing, distributing, and/or selling PFOA/S and/or AFFF containing PFOA/S. By doing so, Defendants impliedly warranted that their

26

products were merchantable, safe, and fit for the ordinary purposes for which it was intended to be used.

170.    It was reasonably foreseeable that Defendants' AFFF and/or PFOA/S would be used in the State of Florida.

171.    It was reasonably foreseeable that the Defendants' AFFF and/or PFOA/S products would result in threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources.

172.    Defendants' AFFF and/or PFOA/s products were manufactured for placement into trade or commerce.

173.    As manufacturers and distributors, Defendants owed a duty to all persons whom its products might foreseeably harm, including the State, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

174.    By manufacturing and selling AFFF and/or PFOA/S products, Defendants warranted that such products were merchantable, safe, and fit for their ordinary purposes.

175.    Defendants' AFFF and/or PFOA/S products reached the State of Florida without substantial change in their conditions and were used in the State of Florida in a reasonably foreseeable and intended manner.

176.    Defendants' AFFF and/or PFOA/S products were defective and unreasonably dangerous when they left the Defendants' control, entered the stream of commerce, and were received in the State of Florida because they were dangerous to an extent beyond that which would be contemplated by the ordinary user of their products.

177.     Defendants' AFFF and/or PFOA/S products were defective in design because, even when used as intended and directed by Defendants, they can result in threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources.

178.     Defendants' AFFF and/or PFOA/S products did not meet a consumer's reasonable expectation as to their safety because of their propensity to threaten and/or injure drinking water, public health, the environment, property, and the State's natural resources when used as intended.

179.     Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were technologically feasible, practical, commercially viable, and marketable at the time the relevant time.

180.     The specific risk of harm—in the form of threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources—from Defendants' products were reasonably foreseeable or discoverable by Defendants.

181.     The design, formulation, manufacture and/or distribution and sale of PFOA/s and/or AFFF containing PFOA/S, which were known to be toxic and extremely mobile and persistent in the environment, was unreasonably dangerous.

182.     Defendants' introduction of AFFF and/or PFOA/S products into the stream of commerce was a proximate cause of damage to the State of Florida requiring investigation, clean-up, abatement, remediation, and monitoring costs and other damages in an amount to be determined at trial.

183.     Defendants are strictly, jointly, and severally liable to the State for all resulting damages, including the costs incurred and to be incurred in responding to the threats and/or injuries to drinking water, public health, the environment, property, and the State's natural

resources from PFOA/S contamination; damages for the public's lost use of the State's natural resources; the costs of assessing the injury to, destruction of, or loss of those natural resources, including the costs of experts to assess the damage; and property damage.

**COUNT THREE**
**Strict Products Liability for Failure to Warn**

184.     The State incorporates by reference the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

185.     The use of AFFF containing PFOA/S in the State of Florida was reasonably foreseeable. Defendants knew or should have known that their AFFF or PFOA/S products threatened and/or injured drinking water, public health, the environment, property, and the State's natural resources when used as intended.

186.     It was foreseeable that the PFOA/S from the AFFF would enter the soil and groundwater and would result in the contamination of property and, potentially, of drinking water supplies that rely upon the groundwater for the source of drinking water.

187.     Defendants had a duty to warn the users of AFFF of these hazards.

188.     Defendants, however, failed to provide adequate warnings of these hazards.

189.     Defendants' failure to issue the proper warning relating to AFFF and/or PFOA/S products affected the market's acceptance of AFFF products containing PFOA/S.

190.     Defendants' failure to issue the proper warning relating to AFFF and/or PFOA/S products prevented the users of the products from treating them differently with respect to use and environmental cleanup.

191.     Defendants' failures to issue the proper warning relating to AFFF and/or PFOA/S products rendered the products unreasonably dangerous.

192.     Defendants' action in placing AFFF and/or PFOA/S products into the stream of commerce was a direct and proximate cause of Florida's damages.

193.     As a direct and proximate result of Defendants' failure to warn, the State has suffered damages—threats to and/or injury of drinking water, public health, the environment, property, and the State's natural resources.

194.     Defendants are strictly, jointly, and severally liable to the State for all resulting damages, including the costs incurred and to be incurred in responding to the threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources from PFOA/S contamination; damages for the public's lost use of the State's natural resources; the costs of assessing the injury to, destruction of, or loss of those natural resources, including the costs of experts to assess the damage; and property damage.

## COUNT FOUR
### Restitution

195.     The State incorporates by reference the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

196.     The storage and use of AFFF and/or PFOA/S products in Florida has threatened and injured drinking water, public health, the environment, property, and the State's natural resources.

197.     Defendants caused these threats and/or injuries.

198.     Defendants had and continue to have duties to abate these threats and/or injuries.

199.     Defendants have failed to fulfill their duties.

200.     The State has begun discharging Defendants' duties to abate these threats and/or injuries, and absent complete injunctive relief, the State will continue to discharge those duties.

30

201. By discharging Defendants' duties to abate these threats and/or injuries, the State has conferred a benefit upon Defendants, and absent restitution, Defendants are unjustly enriched.

202. Defendants are jointly and severally liable to the State for the reasonable value of the benefit conferred upon them by the State.

## COUNT FIVE
### Negligence

203. The State incorporates by reference the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

204. Defendants had a duty to the State of Florida to manufacture and/or market, distribute, and sell their AFFF and/or PFOA/S products in a manner that avoided contamination to the environment and harm to those who foreseeably would be injured by their products.

205. The use of AFFF and PFOA/S products was reasonably foreseeable. Defendants knew or should have known that their products would contaminate soil and groundwater with PFOA/S, creating a significant threat to human health and the environment. Defendants had a duty to prevent the release of PFOA/S in the foreseeable uses of AFFF.

206. Defendants breached their duties when they negligently manufactured a dangerous product, negligently marketed, distributed, and sold that product, and/or negligently failed to give adequate warning that such products should not have been used in a manner such as to result in the contamination of soil and groundwater.

207. Defendants further intended that users of AFFF would rely on the negligent marketing, and users of AFFF justifiably did so.

31

208. In the alternative, Defendants intended that users of AFFF would rely on Defendants' statements that were false, and users of AFFF justifiably did so. Further, Defendants were negligent in obtaining or communicating the information.

209. As a direct and proximate result of Defendants' breaches of their duties, Defendants caused the State to suffer actual losses, including threatening and/or injuring drinking water, public health, the environment, property, and the State's natural resources.

## COUNT SIX
### Trespass

210. The State incorporates by reference the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

211. Defendants knew with substantial certainty at the time of their manufacture and sale of AFFF and/or PFOA/S products that their products were reasonably likely to result in contamination of the State.

212. Defendants' acts and omissions were substantially certain to and did result in an intrusion of Defendants' products onto the State's land.

213. As a direct and proximate result of Defendants' acts and omissions, Defendants caused the State to suffer actual losses. Specifically, the State has endured threats and/or injury to its drinking water, public health, the environment, property, and the State's natural resources.

## COUNT SEVEN
### Violation of Florida's Uniform Fraudulent Transfer Act (DuPont)

214. The State incorporates by reference the allegations contained in paragraphs 1 through 155 as if fully set forth herein.

215. The State seeks equitable and other relief pursuant to the Florida Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. § 726.101, et seq., against the DuPont defendants.

32

216.    Under the FUFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Fla. Stat. § 726.105.

217.    The DuPont defendants have (a) acted with actual intent to hinder, delay, and defraud parties, and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur debts beyond its ability to pay as they became due.

218.    DuPont engaged in acts in furtherance of a scheme to transfer E.I. du Pont de Nemours and Company's assets out of the reach of parties such as the State that have been damaged as a result of DuPont's conduct, omissions, and actions described in this Complaint.

219.    It is primarily E.I. du Pont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed distributed, and/or sold PFOA/S or AFFF containing PFOA/S with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would injure the State.

220.     As a result of the transfer of assets and liabilities described in this Complaint, DuPont has attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution, and/or sale of PFOA/S or AFFF containing PFOA/S.

221.     At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E.I. du Pont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries for the manufacturing, marketing, distribution, and/or sale of PFOA/S or AFFF containing PFOA/S.

222.     DuPont acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E.I. du Pont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

223.     At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

224.     Pursuant to Fla. Stat. § 726.108, the State seeks avoidance of the transfer of E. I. du Pont de Nemours and Company's liabilities for the claims brought in this Complaint and to hold DuPont liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

225.     The State further seeks all other rights and remedies that may be available to it under FUFTA, including pre-judgment remedies as available under applicable law, as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of Florida prays for the following relief:

a.      The acts described herein be adjudged unlawful;

b.      Defendants be enjoined to fund the State's investigation of, and remediation efforts related to contamination statewide or to perform those activities themselves;

c.      Plaintiff recover all measures of damages for injuries to, destruction of, or loss of the State's natural resources;

d.      Plaintiff recover restitution on behalf of Florida agencies;

e.      Plaintiff recover its attorneys' fees, costs of investigation, and other costs as provided by law;

f.      An order abating the public nuisance created and maintained by Defendants and ordering any injunctive relief that the Court finds appropriate under law; and

g.      An order ordering such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 15th day of April, 2022.

**ASHLEY MOODY**
**Attorney General**

*/s/ Andrew H. Butler*

John Guard (FBN #374600)
Chief Deputy Attorney General
John.Guard@myfloridalegal.com

R. Scott Palmer (FBN #220353)
Chief of Complex Enforcement
Scott.Palmer@myfloridalegal.com

Gregory S. Slemp (FBN #478865)
Special Counsel for Litigation
Greg.Slemp@myfloridalegal.com

Andrew H. Butler (FBN #123507)
Assistant Attorney General
Andrew.Butler@myfloridalegal.com

Christopher A. Knight (FBN #1022342)
Assistant Attorney General
Christopher.Knight@myfloridalegal.com

Department of Legal Affairs
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Counsel for State of Florida

IN THE CIRCUIT COURT OF THE THIRTEENTH JUDICIAL CIRCUIT
IN AND FOR HILLSBOROUGH COUNTY, FLORIDA

STATE OF FLORIDA

     Plaintiff,                                   JURY TRIAL DEMANDED

v.                                        Case No.: 2022-CA-3265

TYCO FIRE PRODUCTS LP;
CHEMGUARD, INC.;
BUCKEYE FIRE EQUIPMENT COMPANY;
NATIONAL FOAM, INC.;
KIDDE-FENWAL, INC.;
DYNAX CORPORATION;
E.I. DU PONT DE NEMOURS & COMPANY;
THE CHEMOURS COMPANY;
THE CHEMOURS COMPANY FC, LLC;
CORTEVA, INC.;
DUPONT DE NEMOURS, INC.;
UTC FIRE & SECURITY AMERICAS
CORPORATION, INC.;
CARRIER GLOBAL CORPORATION;
CLARIANT CORPORATION;
ARCHROMA US., INC.;
BASF CORPORATION;
ARKEMA, INC.;
CHEMICALS INCORPORATED;
MINE SAFETY APPLIANCE COMPANY, LLC;
GLOBE MANUFACTURING COMPANY, LLC;
W.L. GORE & ASSOCIATES, INC.;
AMEREX CORPORATION;
DAIKIN AMERICA, INC.;
HONEYWELL INTERNATIONAL, INC.; and
HONEYWELL SAFETY PRODUCTS USA, INC.

     Defendants.

_____/

**<u>AMENDED COMPLAINT</u>**

Plaintiff State of Florida ("the State" or "Florida"), by and through its attorney, Ashley Moody, Attorney General for the State of Florida, brings this action against Tyco Fire Products LP; Chemguard, Inc.; Buckeye Fire Equipment Company; National Foam, Inc.; Kidde-Fenwal, Inc.; Dynax Corporation; E.I. du Pont de Nemours & Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; DuPont de Nemours, Inc.; UTC Fire & Security Americas Corporation, Inc.; Carrier Global Corporation; Clariant Corporation; Archroma U.S., Inc.; BASF Corporation; Arkema, Inc.; Chemicals Incorporated; Mine Safety Appliance Company, LLC; Globe Manufacturing Company, LLC; W.L. Gore & Associates, Inc.; Amerex Corporation; Daikin America, Inc.; Honeywell International, Inc.; and Honeywell Safety Products USA, Inc., and alleges as follows:

## NATURE OF THIS ACTION

1.      This action arises from threats to public health and contamination in the environment caused by Defendants' manufacturing and distribution of Aqueous Film Forming Foam ("AFFF") and components thereof.

2.      AFFF is a product that has been used to extinguish fires involving fuel or other flammable liquids including aviation fires and fires in industrial facilities with automatic fire suppression systems. AFFF products are also used to train firefighters and test firefighting equipment. AFFF products contained the chemical compounds perfluorooctanoic acid/perfluorooctanoate ("PFOA"), perfluorooctane sulfonic acid/perfluorooctane sulfonate ("PFOS"), and/or chemical compounds that transform into PFOA and/or PFOS (collectively, "PFOA/S").

3.      Human exposure to PFOA is associated with an increased risk of kidney and testicular cancer, ulcerative colitis, and other conditions. Human exposure to PFOA and PFOS is

2

associated with an increased risk of immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, and other adverse health conditions.

4. Defendants designed, manufactured, marketed, and sold PFOA/S and/or AFFF containing PFOA/S that were discharged into the environment at or from sites throughout Florida.

5. The State brings this action for: (1) compensatory damages consisting of (i) costs incurred and to be incurred by the State in investigating, monitoring, remediating, and otherwise responding to injuries and/or threats to public health and the environment caused by Defendants' products; and (ii) damages for harm to the State's natural resources; and (2) injunctive and equitable relief in the form of a monetary relief for the State's reasonably expected future damages, and/or requiring defendants to perform investigative and remedial work in response to the threats and injuries they have caused.

## PARTIES

6. Florida is a sovereign state with a population of over twenty million. The State brings this action as *parens patriae* and as representative of all residents and citizens of the State, as trustee and guardian of the State's natural resources, and on its own behalf in its proprietary capacity.

7. Defendant Tyco Fire Products, LP ("Tyco") is a limited partnership organized and existing under the laws of the State of Delaware, having its principal place of business at One Stanton Street, Marinette, Wisconsin. Tyco does business throughout the United States, including conducting business in Florida.

8. Tyco manufactures the Ansul brand of products and is the successor-in-interest to the corporation formerly known as The Ansul Company ("Ansul") (hereinafter, Ansul and/or

3

Tyco as the successor-in-interest to Ansul will be referred to collectively as "Tyco/Ansul"). At all times material hereto, Tyco/Ansul designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

9. Defendant Chemguard Inc. ("Chemguard") is a corporation organized under the laws of the State of Texas, with its principal place of business located at One Stanton Street, Marinette, Wisconsin 54143. Chemguard does business throughout the United States, including conducting business in Florida. At all times material hereto, Chemguard designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

10. Defendant Buckeye Fire Equipment Company ("Buckeye Fire") is a corporation organized and existing under the laws of the state of Ohio, with its principal place of business at 110 Kings Road, Kings Mountain, North Carolina 28086. Buckeye does business throughout the United States, including conducting business in Florida. At all times relevant, Buckeye Fire designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

11. Defendant National Foam, Inc., (a/k/a Chubb National Foam) (collectively "National Foam") is a Delaware corporation, having a principal place of business at 141 Junny Road, Angier, North Carolina 27501. National Foam is the successor in interest to Angus Fire Armour Corporation, and manufactures the Angus brand of products. National Foam does business throughout the United States, including conducting business in Florida. References to "National Foam" herein shall also refer to AFFF manufactured, marketed and sold under the "Angus" name and "Angus Fire" brand. At all times relevant, National Foam manufactured, designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

12. Defendant Kidde-Fenwal, Inc. ("Kidde"), is a corporation organized under the laws of the State of Delaware, with its principal place of business located at One Financial Plaza,

4

Hartford, Connecticut 06101. Kidde is the successor-in-interest to Kidde Fire Fighting, Inc. (f/k/a Chubb National Foam, Inc. f/k/a National Foam System, Inc.). Kidde does business throughout the United States, including conducting business in Florida. At all times material hereto, Kidde designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

13.     Defendant Dynax Corporation ("Dynax") is a Delaware Corporation that conducts business throughout the United States, including business in Florida. Its principal place of business is 103 Fairview Park Drive Elmsford, New York, 10523-1544.

14.     In 1991, Dynax Corporation entered the AFFF business, quickly becoming a leading global producer of fluorosurfactants and fluorochemical foam stabilizers used in firefighting foam agents. On information and belief, at all times material hereto, Dynax designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

15.     Defendant UTC Fire & Security Americas Corporation, Inc. ("UTC") is a Delaware corporation with its principal place of business at 13995 Pasteur Blvd., Palm Beach Gardens, Florida 33418. Upon information and belief, UTC was a division of United Technologies Corporation. UTC does and/or has done business throughout the United States, including in Florida. At all times material hereto, UTC designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

16.     Defendant Carrier Global Corporation ("Carrier") is a Delaware corporation with its principal place of business located at 13995 Pasteur Boulevard, Palm Beach Gardens, Florida 33418. Upon information and belief, UTC is now a division of Carrier. Upon information and belief, Carrier does and/or has done business throughout the United States, including in Florida.

17.     Defendant Clariant Corporation ("Clariant") is a New York corporation with its principal place of business located at 4000 Monroe Road, Charlotte, North Carolina 28205.

5

Clariant does business throughout the United States, including conducting business in Florida. At all times material hereto, Clariant designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

18.     Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business located at 5435 77 Center Dr., # 10, Charlotte, North Carolina 28217. Archroma does business throughout the United States, including conducting business in Florida. At all times material hereto, Archroma designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

19.     Defendant BASF Corporation ("BASF") is a Delaware corporation with its principal place of business located at 100 Park Avenue, Florham Park, New Jersey 07932. BASF does business throughout the United States, including conducting business in Florida. At all times material hereto, BASF designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

20.     Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business located at 900 1st Avenue, King of Prussia, Pennsylvania 19406. Arkema does business throughout the United States, including conducting business in Florida. At all times material hereto, Arkema designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

21.     Defendant Chemicals Incorporated ("Chem Inc.") is a Texas corporation with its principal place of business located at 12321 Hatcherville Road, Baytown, Texas 77521. Chem Inc. does business throughout the United States, including conducting business in Florida. At all times material hereto, Chem Inc. designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

6

22.     Defendant Mine Safety Appliance Company, LLC ("Mine Safety") is a Pennsylvania corporation with its principal place of business located at 1000 Cranberry Woods Drive, Cranberry Township, Pennsylvania 16066. Mine Safety does business throughout the United States, including conducting business in Florida. At all times material hereto, Mine Safety designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

23.     Defendant Globe Manufacturing Company, LLC ("Globe") is a New Hampshire corporation with its principal place of business located at 37 Loudon Road, Pittsfield, New Hampshire 03263. Globe does business throughout the United States, including conducting business in Florida. At all times material hereto, Globe designed, distributed, manufactured and/or sold AFFF containing PFOA/S. Upon information and belief, Defendant Mine Safety acquired Globe and its subsidiaries in 2017 and continues to do business under the Globe brand.

24.     Defendant W.L. Gore & Associates, Inc. ("Gore") is a Delaware corporation with its principal place of business located at 555 Paper Mill Road, Newark, Delaware 19711. Gore does business throughout the United States, including conducting business in Florida. At all times material hereto, Gore designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

25.     Defendant Amerex Corporation ("Amerex") is an Alabama corporation with its principal place of business located at 7595 Gadsden Highway, Trussville, Alabama 35173. Amerex does business throughout the United States, including conducting business in Florida. At all times material hereto, Amerex designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

26.     Defendant Daikin America, Inc. ("Daikin") is a Delaware corporation with its principal place of business located at 20 Olympic Drive, Orangeburg, New York 10962. Daikin

7

does business throughout the United States, including conducting business in Florida. At all times material hereto, Daikin designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

27.     Defendant Honeywell International, Inc. ("Honeywell International") is a Delaware corporation with its principal place of business located at 855 South Mint Street, Charlotte, North Carolina 28202. Honeywell International does business throughout the United States, including conducting business in Florida. At all times material hereto, Honeywell International designed, distributed, manufactured and/or sold AFFF containing PFOA/S.

28.     Defendant Honeywell Safety Products USA, Inc. ("Honeywell") is a Delaware corporation with its principal place of business located at 855 South Mint Street, Charlotte, North Carolina 28202. Honeywell does business throughout the United States, including conducting business in Florida. At all times material hereto, Honeywell designed, distributed, manufactured and/or sold AFFF containing PFOA/S. Upon information and belief, Honeywell is a wholly owned subsidiary of Honeywell International.

29.     Defendant E.I. du Pont De Nemours & Co. is a Delaware Corporation and does business throughout the United States, including conducting business in Florida. Its principal place of business is 974 Centre Road, Wilmington, Delaware 19805. E.I. du Pont De Nemours & Co. designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

30.     Defendant The Chemours Company is a Delaware Corporation and conducts business throughout the United States, including conducting business in Florida. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899. The Chemours Company designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

8

31.     The Chemours Company was incorporated as a subsidiary of E.I. du Pont De Nemours & Co. as of April 30, 2015. From that time until July 2015, The Chemours Company was a wholly-owned subsidiary of E.I. du Pont De Nemours & Co. In July, 2015, E.I. Du Pont de Nemours & Co. spun off The Chemours Company and transferred to The Chemours Company its "performance chemicals" business line, which includes its fluoroproducts business, distributing shares of The Chemours Company stock to E.I. du Pont De Nemours & Co. stockholders, and The Chemours Company has since been an independent, publicly traded company.

32.     Defendant The Chemours Company FC, L.L.C. is a Delaware Corporation and conducts business throughout the United States including conducting business in Florida. Its principal place of business is 1007 Market Street, Wilmington, Delaware, 19899. The Chemours Company FC, L.L.C. designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

33.     The Chemours Company and The Chemours Company FC, LLC are collectively referred to throughout this Complaint as "Chemours."

34.     E.I. du Pont De Nemours & Co. merged with The Dow Chemical Company in August 2017 to create DowDuPont Inc. (DowDuPont). E.I. du Pont De Nemours & Co. and The Dow Chemical Company each merged with wholly-owned subsidiaries of DowDuPont and, as a result, became subsidiaries of DowDuPont. Since that time, DowDuPont has effected a series of separation transactions to separate its businesses into three independent, publicly-traded companies for each of its agriculture, materials science, and specialty products businesses, discussed below.

9

35. Defendant Corteva, Inc. ("Corteva") is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware. Corteva Inc. does business throughout the United States, including conducting business in Florida. Corteva designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

36. On June 1, 2019, DowDuPont separated its agriculture business through the spinoff of Corteva, Inc.

37. Corteva, Inc. was initially formed in February 2018. From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of DowDuPont.

38. On June 1, 2019, DowDuPont distributed to DowDuPont stockholders all issued and outstanding shares of Corteva, Inc. common stock by way of a pro rata dividend. Following that distribution, Corteva, Inc. is the direct parent of E. I. du Pont de Nemours & Co. and holds certain DowDuPont assets and liabilities, including DowDuPont's agriculture and nutritional businesses.

39. Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont Inc.) is a Delaware corporation with its principal place of business at 974 Centre Road, Wilmington, Delaware 19805. DuPont de Nemours, Inc. does business throughout the United States, including conducting business in Florida. DuPont de Nemours, Inc. designed, distributed, manufactured and/or sold PFOA/S and/or AFFF containing PFOA/S.

40. On June 1, 2019, DowDuPont, the surviving entity after the spin-off of Corteva, Inc. and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc., to be known as DuPont (New DuPont). New DuPont retained assets in the specialty products business lines following the above described spin-offs, as well as the balance of the financial assets and liabilities of E.I DuPont not assumed by Corteva, Inc.

10

41.     Defendants E. I. du Pont de Nemours and Company; The Chemours Company; The Chemours Company FC, LLC; Corteva, Inc.; and DuPont de Nemours, Inc. are collectively referred to as "DuPont" throughout this Complaint.

42.     Some or all of the AFFF manufactured and sold by the Defendants contained PFOA/S components manufactured and sold by DuPont.

43.     Defendants, among other things: (a) designed, manufactured, formulated, promoted, marketed, sold, and/or otherwise supplied (directly or indirectly) PFOA/S and/or AFFF containing PFOA/S that was released into Florida; (b) acted with actual or constructive knowledge that PFOA/S for use in AFFF and AFFF containing PFOA/S would be released into the State; (c) promoted PFOA/S for use in AFFF, despite the availability of reasonable alternatives and their actual or constructive knowledge that the contamination alleged in this Complaint would be the inevitable result of their conduct.

44.     When reference is made in this Complaint to any act or omission of any of the Defendants, it shall be deemed that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation, or control of the affairs of Defendants, and did so while acting within the scope of their duties, employment, or agency.

45.     Any and all references to a Defendant or Defendants in this Complaint include any predecessors, successors, parents, subsidiaries, affiliates, and divisions of the named Defendants.

**VENUE**

46.     This Court has jurisdiction to hear these common law causes of action.

11

47.     Defendants' conduct alleged herein occurred in or affected more than one judicial circuit in the State.

48.     Venue is proper in the Thirteenth Judicial Circuit for Hillsborough County, Florida because the causes of action arose at least in part in Tampa, Florida; Defendants transacted business in or their products were introduced into the environment in Tampa, Florida; some of the conduct alleged herein occurred in Tampa, Florida.

## FACTUAL ALLEGATIONS

**A.      PFOA/S Generally – Description, Development, and Regulatory History**

   *i.     PFOA/S and the Threats they Pose to Public Health and the Environment*

49.     Per- and poly-fluoroalkyl substances are chemical compounds containing fluorine and carbon atoms. These substances have been used for decades in the manufacture of, among other things, household and commercial products that resist heat, stains, oil, and water. These substances are not naturally occurring and must be manufactured.

50.     The two most widely studied types of these substances are PFOA and PFOS. PFOA, PFOS, and chemical compounds that transform into PFOA and/or PFOS are referred to collectively herein as "PFOA/S."

51.     PFOA/S have unique properties that cause them to be: (i) mobile and persistent, meaning that they readily spread into the environment where they break down very slowly; (ii) bioaccumulative and biomagnifying, meaning that they tend to accumulate in organisms and up the food chain; and (iii) toxic, meaning that they present serious health risks to humans and animals. Because PFOA/S have these three properties, they pose a significant threat to public health and the environment.

12

52.     PFOA/S easily dissolve in water, and thus they are mobile and readily spread in the environment. PFOA/S also readily contaminate soils and leach from the soil into groundwater, where they can travel significant distances.

53.     PFOA/S are characterized by the presence of multiple carbon-fluorine bonds, which are exceptionally strong and stable. As a result, PFOA/S are thermally, chemically, and biologically stable and they resist degradation due to light, water, chemical, and biological processes.

54.     Bioaccumulation occurs when an organism absorbs a substance at a rate faster than the rate at which the substance is lost by metabolism and excretion. Biomagnification occurs when the concentration of a substance in the tissues of organisms increases up the food chain.

55.     PFOA/S bioaccumulate because they are relatively stable inside an individual organism. Because of this stability, any newly introduced PFOA/S will be added to any PFOA/S already present. In addition to ingestion, PFOA/S can be introduced into humans and other mammals by, among other routes, crossing the placenta from mother to fetus and by passing to infants through breast milk. In humans, PFOA/S remain in the body for years. PFOA/S biomagnify up the food chain, such as when humans eat fish that have ingested PFOA/S.

56.     Exposure to PFOA/S can be toxic and may pose serious health risks to humans and to animals. Human health effects associated with PFOA exposure include kidney and testicular cancer, thyroid disease, high cholesterol, ulcerative colitis, liver damage, and pregnancy-induced hypertension (also known as preeclampsia). Human health effects associated with PFOS exposure include immune system effects, changes in liver enzymes and thyroid hormones, low birthweight, high uric acid, and  high cholesterol. In laboratory testing on

animals, PFOA/S have caused the growth of tumors, changed hormone levels, and affected the function of the liver, thyroid, pancreas, and immune system.

> ii.     *Development of AFFF Products*

57.    PFOA/S were developed in the 1940s, using a process called electrochemical fluorination to create carbon-fluorine bonds. It was soon discovered that these types of substances have strong surfactant properties, meaning that they reduce the surface tension between a liquid and another liquid or solid. This reduced surface tension enabled the development of a myriad of products that resist heat, stains, oil, and water.

58.    Building on these earlier experiments, the first AFFF firefighting foams were developed in the early 1960s. These AFFF products contained PFOS and were developed to suppress flammable liquid fires, which cannot be effectively extinguished with water alone. Later AFFF products contained various formulations of PFOA/S.

59.    AFFF concentrate containing PFOA/S forms a foam when it is mixed with water and ejected from a nozzle. This foam then coats the fire, blocking the supply of oxygen and creating a cooling effect. These effects help extinguish the fire. A film also forms to continue smothering the fire after the foam has dissipated.

60.    Defendants and/or their predecessors designed, distributed, manufactured and/or sold PFOA/S or AFFF containing PFOA/S.

> iii.    *Defendants' Knowledge of the Threats Posed to Public Health and the Environment by PFOA and PFOS*

61.    Since at least 1951, DuPont and, on information and belief, later Chemours, designed, manufactured, marketed, and sold products containing PFOA/S, including Teflon and Stainmaster carpet, and more recently PFOA/S as a feedstock for AFFF.

14

62.     Upon information and belief, for decades DuPont/Chemours knew or should have known that PFOA/S is mobile, persistent, bioaccumulative, biomagnifying, and toxic.

63.     Upon information and belief, DuPont/Chemours concealed from the public and government agencies its knowledge of the risk of harm to the public posed by PFOA/S.

64.     In 1978, DuPont began to review and monitor the health conditions of its workers who were potentially being exposed to PFOA. DuPont subsequently found that PFOA is "toxic" and that "continued exposure is not tolerable," but did not disclose this to the public or to the United States Environmental Protection Agency ("EPA").

65.     In 1981, DuPont failed to disclose to the public and to the EPA data demonstrating the movement of PFOA from mothers to fetuses across the placenta. It also failed to disclose to the public and to EPA widespread PFOA contamination in public drinking water sources resulting from discharges at its Washington Works facility in Washington, West Virginia, where PFOA concentrations exceeded DuPont's own Community Exposure Guideline.

66.     In 1991, DuPont researchers recommended a follow-up study to a study from ten years earlier of employees who might have been exposed to PFOA. The earlier study showed elevated liver enzymes in the blood of DuPont workers. On information and belief, for the purpose of avoiding or limiting liability, DuPont chose not to conduct the follow up study, instead postponing it until after they were sued.

67.     In or around December 2005, pursuant to TSCA, 15 U.S.C. §§ 2607(e) and 2615(a), DuPont agreed to pay a $10.25 million fine to the federal government arising from its failures to disclose information to EPA about PFOA's health risks. Upon information and belief, in statements to the public and government regulators, DuPont has repeatedly and falsely claimed that human exposure to PFOA has no adverse health consequences. In a May/June 2008

15

publication, for example, DuPont stated that "the weight of the evidence indicates that PFOA exposure does not pose a health risk to the general public," and "there are no human health effects known to be caused by PFOA, although study of the chemical continues."

68.     DuPont made those statements despite the fact that in 2006, its own Epidemiology Review Board advised the company not to make public statements asserting that PFOA does not pose any risk to health.

69.     On information and belief, all Manufacturers and DuPont/Chemours knew or should have known that, in its intended and common use, AFFF Products and PFOA/S feedstocks would very likely injure or threaten public health and the environment.

70.     On information and belief, this knowledge was accessible to all Manufacturers and to DuPont/Chemours. For example, in 1970, a well-established firefighting trade association was alerted to the toxic effects on fish of a chemical compound related to PFOS. On information and belief, at least the following defendants are and/or were members of this trade association: Tyco/Ansul, Chemguard, and National Foam/Angus.

71.     Additionally, on information and belief, all Manufacturers and Dupont/Chemours knew or should have known that their AFFF products and feedstocks easily dissolve in water, because the products were designed to be mixed with water; are mobile, because the products were designed to quickly form a thin film; resist degradation, because that is the nature of the products' chemical composition, and on information and belief the products have long shelf-lives; and tend to bioaccumulate, because information regarding the presence of substances with carbon-fluorine bonds in the blood of the general population was publicly available.

       *iv.*     *DuPont's Spinoff of Chemours*

72.     In February 2014, DuPont formed Chemours as a wholly-owned subsidiary.

73. In July 2015, DuPont used Chemours to spin off its "performance chemicals" business line.

74. At the time of the spinoff, the performance chemicals division consisted of DuPont's Titanium Technologies, Chemical Solutions and Fluorochemicals segments (the "Performance Chemicals Business").

75. Until the spinoff was complete, Chemours was a wholly-owned subsidiary of DuPont. Although Chemours had a separate board, the board was controlled by DuPont employees.

76. Prior to the spinoff of Chemours, in 2005, DuPont agreed to pay $10.25 million to resolve eight counts brought by the United States Environmental Protection Agency ("EPA") alleging violations of the Toxic Substances Control Act ("TSCA") and the Resource Conservation and Recovery Act ("RCRA") concerning the toxicity of PFOA/S compounds. At the time, it was the largest such penalty in history.

77. DuPont also promised to phase out production and use of PFOA/S by 2015.

78. Also in 2005, DuPont settled a class action lawsuit filed on behalf of 70,000 residents of Ohio and West Virginia for $343 million.

79. Under the terms of the 2005 class action settlement, DuPont agreed to fund a panel of scientists to determine if any diseases were linked to PFOA/S exposure, to filter local water for as long as C-8 concentrations exceeded regulatory thresholds, and to set aside $235 million for ongoing medical monitoring of the affected community.

80. After 8 years, the C-8 Science Panel found several significant diseases, including cancer, linked to PFOA/S.

81.     Once the spinoff was complete, seven new members of the Chemours board were appointed, for an 8-member board of directors of the new public company.

82.     The new independent board appointed upon the completion of the spinoff did not take part in the negotiations of the terms of the separation.

83.     In addition to the transfer of assets, Chemours accepted broad assumption of liabilities for DuPont's historical use, manufacture, and discharge of PFOA/S, although the specific details regarding the liabilities that Chemours assumed are set forth in the non-public schedules.

84.     Within the publicly available information about the transfer is the fact that Chemours agreed to indemnify DuPont against, and assumed for itself, all "Chemours Liabilities," which is defined broadly to include, among other things, "any and all liabilities relating," "primarily to, arising primarily out of or resulting primarily from the operation of or conduct of the [Performance Chemicals] Business at any time."

85.     Chemours agreed to indemnify DuPont against and assume for itself the Performance Chemical Business's liabilities regardless of: (I) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud, or misrepresentation by any member of the DuPont group or the Chemours group; and (v) which entity is named in any action associated with any liability.

86.     Chemours agreed to indemnify DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

87.     Such liabilities were deemed "primarily associated" if DuPont reasonably determined that 50.1% of the liabilities were attributable to the Performance Chemicals Business.

88.     Chemours also agreed to use its best efforts to be fully substituted for DuPont with respect to "any order, decree, judgment, agreement, or Action with respect to Chemours Assumed Environmental Liabilities...."

89.     In addition to the assumption of such liabilities, Chemours also provided broad indemnification to DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

90.     The effect of creation of Chemours was to segregate a large portion of DuPont's environmental liabilities, including liabilities related to its PFOA/S chemicals and products.

91.     The consolidation of DuPont's performance chemical liabilities has potentially limited the availability of funds arising out of DuPont's liability.

92.     As Chemours explained in its November 2016 SEC filing: "[s]ignificant unfavorable outcomes in a number of cases in the [Ohio] MDL could have a material adverse effect on Chemours consolidated financial position, results of operations, or liquidity."

93.     At the time of the transfer of its Performance Chemicals Business to Chemours, DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries from the manufacture of PFOA/S compounds and products that contain PFOA/S compounds.

v.      *Evolving Governmental Understanding of the Levels of Acceptably Safe Exposure to PFOA/S*

94.     Federal law requires chemical manufacturers and distributors to immediately notify the United States Environmental Protection Agency ("EPA") if they have information that "reasonably supports the conclusion that such substance or mixture presents a substantial risk of

19

injury to health or the environment." See Toxic Substances Control Act ("TSCA"), 15 U.S.C. § 2607(e).

95.     On information and belief, Defendants fail to comply with their obligations to notify EPA about the "substantial risk of injury to health or the environment" posed by their AFFF products and feedstocks. See TSCA, 15 U.S.C. § 2607(e).

96.     In or around 1998, EPA began investigating safety concerns regarding PFOA/S after some limited disclosures by industry participants.

97.     Beginning in 2009, EPA issued health advisories about the levels of exposure to PFOA and PFOS in drinking water that it believed were protective of public health. As described on EPA's website, "health advisories are non-enforceable and non-regulatory and provide technical information to states[,] agencies and other health officials on health effects, analytical methodologies, and treatment technologies associated with drinking water contamination." *Drinking Water Health Advisories for PFOA and PFOS: Questions and Answers,* available at https://19january2021snapshot.epa.gov/ground-water-and-drinking-water/drinking-water-health-advisories-pfoa-and-pfos-questions-and-answers_.html (last visited April 6, 2022).

98.     The recommendations in EPA's health advisories evolved as EPA learned more about PFOA/S.

99.     On January 8, 2009, EPA issued Provisional Health Advisories for PFOA and PFOS, advising that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively. *See Provisional Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, available at https://19january2021snapshot.epa.gov/sites/static/files/2015-09/documents/pfoa-pfos-provisional.pdf, at p.1, n.1 (last visited April 6, 2022).

20

100. On or around May 19, 2016, the EPA issued updated Drinking Water Health Advisories for PFOA and PFOS, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt. *See Lifetime Health Advisories and Health Effects Support Documents for PFOA and PFOS*, 81 Fed. Reg. 33, 250-51.

**B.      The Use of Defendants' Products in Florida**

101. AFFF either manufactured by Defendants or containing PFOA/S constituents manufactured by Defendants have been used for decades throughout Florida at military installations, civilian airports, industrial facilities, firefighting training centers, and other facilities.

102. On information and belief, contamination of PFOA/S from AFFF products is commonplace at these sites. On information and belief, natural resources at, adjacent to, connected with, or otherwise related to the sites have also been contaminated with PFOA/S.

103. On information and belief, Defendants did not provide warnings regarding the public health and environmental hazards associated with discharging their products into the environment. Nor did Defendants provide adequate instructions about how to avoid or mitigate such hazards.

i.      *The Floridan Aquifer System*

104. PFOA/S readily migrate vertically from unsaturated soils to groundwater and can migrate in other directions in surface water and in plumes underground. These plumes can commingle with plumes from other PFOA/S sources, creating regional impacts to drinking water supplies.

105. Within Florida, an estimated 90 percent of drinking water is derived from aquifers.

106. Many portions of Florida's major drinking water aquifers are highly vulnerable to contamination from PFOA/S, including (at least) the unconfined sand-and-gravel aquifer of northwest Florida, the karstic Floridan aquifers in the north and north-central portion of the State, and the unconfined Biscayne aquifer in South Florida. This vulnerability results from the lack of confining layers overlying these portions.

107. Additionally, PFOA/S contamination within the karstic limestone portion of the aquifer system has the potential to be transported to Florida's major springs such as Wakulla Springs, Manatee Springs, Blue Springs, and Homosassa Springs. PFOA/S contamination at these springs can negatively impact the ecology of these environments.

108. On information and belief, because of PFOA/S' mobility and persistence and, because of Florida's unique hydrogeology, PFOA/S discharge at a site can harm off-site environments and contaminate off-site drinking sources.

109. Defendants should be required to fund the State's investigation of, and remediation efforts related to contamination statewide or to perform those activities themselves.

110. Defendants should be required to compensate the State for all injuries to, destruction of, or loss of the State's natural resources.

*ii.* *Sites Where the State has Incurred Costs*

111. As precautionary measures and in order to protect public health and Florida's natural resources from potential PFOA/S contamination from AFFF, the State has undertaken, conducted, and/or overseen initial sampling and/or other oversight activities at numerous sites. The Florida Department of Environmental Protection ("FDEP") conducted preliminary tests— called Preliminary Site Assessments ("PSA")—at certain locations in Florida.

112. The State has incurred costs in connection with investigating and protecting the public from this potential contamination, including costs incurred in connection with conducting

22

PSAs. The State may incur additional costs in connection with PFOA/S contamination at these sites, including costs associated with the State's continuing investigation and possible remediation efforts. Additionally, the State's continuing investigation may reveal that the State's natural resources have been injured at or around these sites.

113. The following is an illustrative, non-exhaustive list of sites where the State has already incurred costs related to PFOA/S testing or remediation.

**Bonita Springs Fire**

114. Bonita Springs Fire Control and Rescue District Station #4 is a fire department located at 27701 Bonita Grande Dr., Bonita Springs, Florida.

115. FDEP began a PSA at this site on or about April 23, 2019.

116. During this PSA, groundwater concentrations of PFOA/S as high as 0.118 micrograms of PFOA/S per liter of ground water were measured at this site.

117. During this PSA, soil concentrations of PFOA/S as high as 2.9 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Englewood Fire Training Center**

118. Englewood Fire Training Center is a fire training school located at 13400 Haligan Way, Englewood, Florida.

119. FDEP began a PSA at this site on or about April 17, 2019.

120. During this PSA, groundwater concentrations of PFOA/S as high as 0.153 micrograms of PFOA/S per liter of ground water were measured at this site.

121. During this PSA, soil concentrations of PFOA/S as high as 1.2 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Florida State Fire College**

23

122. Florida State Fire College is a fire training school located at 11655 NW Gainesville Rd., Ocala, Florida.

123. FDEP began a PSA at this site on or about August 15, 2018.

124. During this PSA, groundwater concentrations of PFOA/S as high as 14.26 micrograms of PFOA/S per liter of ground water were measured at this site.

125. During this PSA, soil concentrations of PFOA/S as high as 210,000 micrograms of PFOA/S per kilogram of soil were measured at this site.

**City of Hialeah Fire Training Facility**

126. City of Hialeah Fire Training Facility is a fire training school located at 7590 W. 24th Ave., Hialeah, Florida.

127. FDEP began a PSA at this site on or about February 13, 2020.

128. During this PSA, groundwater concentrations of PFOA/S as high as 0.91 micrograms of PFOA/S per liter of ground water were measured at this site.

129. During this PSA, soil concentrations of PFOA/S as high as 82 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Hillsborough Community College Fire Academy**

130. Hillsborough Community College Fire Academy is a fire training school located at 5610 E. Columbus Dr., Tampa, Florida.

131. FDEP began a PSA at this site on or about March 25, 2019.

132. During this PSA, groundwater concentrations of PFOA/S as high as 1.56 micrograms of PFOA/S per liter of ground water were measured at this site.

133. During this PSA, soil concentrations of PFOA/S as high as 430 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Indian River State College Fire Academy**

134.     Indian River State College Fire Academy is a fire training school located at 4600 Kirby Loop Rd., Fort Pierce, Florida.

135.     FDEP began a PSA at this site on or about June 5, 2019.

136.     During this PSA, groundwater concentrations of PFOA/S as high as 12.9 micrograms of PFOA/S per liter of ground water were measured at this site.

137.     During this PSA, soil concentrations of PFOA/S as high as 270 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Melbourne Fire Training Facility**

138.     Melbourne Fire Training Facility is a fire training facility located at 1980 Hughes Rd., Melbourne, Florida.

139.     FDEP began a PSA at this site on or about April 8, 2019.

140.     During this PSA, groundwater concentrations of PFOA/S as high as 6.16 micrograms of PFOA/S per liter of ground water were measured at this site.

141.     During this PSA, soil concentrations of PFOA/S as high as 200 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Miami-Dade College Fire Academy**

142.     Miami-Dade College Fire Academy ("Miami-Dade Fire Academy") is a fire training school located at 3180 NW 119th St., Miami-Dade County, Florida.

143.     FDEP began a PSA at this site on or about August 14, 2019.

144.     During this PSA, groundwater concentrations of PFOA/S as high as 1.28 micrograms of PFOA/S per liter of ground water were measured at this site.

**Miami-Dade Fire Rescue**

145. Miami-Dade Fire Rescue ("Miami-Dade Fire") is a fire department located at 9300 NW 41st Street, Doral, Florida.

146. FDEP began a PSA at this site on or about December 18, 2019.

147. During this PSA, groundwater concentrations of PFOA/S as high as 1.28 micrograms of PFOA/S per liter of ground water were measured at this site.

148. During this PSA, soil concentrations of PFOA/S as high as 89 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Monroe County Fire Academy**

149. Monroe County Fire Academy is a fire training school located at US-1, Marathon, Florida.

150. FDEP began a PSA this site on or about September 26, 2019.

151. During this PSA, groundwater concentrations of PFOA/S as high as 17.2 micrograms of PFOA/S per liter of ground water were measured at this site.

152. During this PSA, soil concentrations of PFOA/S as high as 1,400 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Palm Beach County Rescue**

153. Palm Beach County Rescue is a fire department located at 405 Pike Road, West Palm Beach, Florida.

154. FDEP began a PSA at this site on or about August 15, 2019.

155. During this PSA, groundwater concentrations of PFOA/S as high as 1.33 micrograms of PFOA/S per liter of ground water were measured at this site.

156.     During this PSA, soil concentrations of PFOA/S as high as 750 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Pensacola Fire Department**

157.     Pensacola Fire Department is a fire department located at 1 North Q Street, Pensacola, Florida.

158.     FDEP began a PSA at this site on or about June 17, 2019.

159.     During this PSA, groundwater concentrations of PFOA/S as high as 4.01 micrograms of PFOA/S per liter of ground water were measured at this site.

160.     During this PSA, soil concentrations of PFOA/S as high as 21 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Plantation Fire Department**

161.     Plantation Fire Department is a fire department located at 8200 Southwest 3rd Street, Plantation, Florida.

162.     FDEP began a PSA at this site on or about December 17, 2019.

163.     During this PSA, soil concentrations of PFOA/S as high as 20 micrograms of PFOA/S per kilogram of soil were measured at this site.

**Volusia County Fire Training Center**

164.     Volusia County Fire Training Center is a fire training school located at 3889 Tiger Bay Road, Daytona Beach, Florida.

165.     FDEP began a PSA at this site on or about July 30, 2019.

166.     During this PSA, groundwater concentrations of PFOA/S as high as 34.23 micrograms of PFOA/S per liter of ground water were measured at this site.

167. During this PSA, soil concentrations of PFOA/S as high as 1,400 micrograms of PFOA/S per kilogram of soil were measured at this site.

## COUNT ONE
### Public Nuisance

168. The State incorporates by reference the allegations contained in paragraphs 1 through 167 as if fully set forth herein.

169. This is an action against Defendants under Florida common law for damages and abatement of the ongoing public nuisance created by them.

170. The storage and use of AFFF in Florida has threatened and/or injured drinking water, public health, the environment, property, and the State's natural resources, thus causing a public nuisance.

171. The State of Florida alleges violations of Florida common law and, acting on its own behalf and on behalf of its residents, seeks monetary relief and abatement of the ongoing public nuisance created by Defendants.

172. A public nuisance is defined as any annoyance to the community or harm to public health.

173. Defendants participated in the creation and/or maintenance of this public nuisance through, among other things, their marketing and sale of PFOA/S and AFFF containing PFOA/S with defective designs and without providing adequate product instructions or warnings about the risks to drinking water, public health, the environment, property, and natural resources posed by PFOA/S.

174. The public nuisance created by the conduct of the Defendants violates rights common to the Florida public; subverts public order, decency, or morals; and causes

28

inconvenience or damage to the public in general. Defendants' conduct has harmed public health in Florida and is an annoyance to Florida communities.

175.    Throughout the State of Florida, Defendants' conduct has affected, and continues to affect, a considerable number of people and entire communities.

176.    Defendants' conduct has injuriously affected public rights, including the right to public health, safety, peace, comfort, and convenience, in communities throughout Florida.

177.    The public nuisance created by Defendants has imposed severe economic costs on the State of Florida, its residents, and its communities. The State of Florida, acting on its own behalf and on behalf of its residents, therefore seeks monetary relief from Defendants.

178.    Defendants are strictly, jointly, and severally liable to the State for all resulting damages, including the costs incurred and to be incurred in responding to the threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources from PFOA/S contamination; damages for the public's lost use of the State's natural resources; the costs of assessing the injury to, destruction of, or loss of those natural resources, including the costs of experts to assess the damage; and property damage.

179.    The State is entitled to an injunction requiring Defendants to abate the public nuisance.

### COUNT TWO
### Strict Products Liability for Defective Design

180.    The State incorporates by reference the allegations contained in paragraphs 1 through 167 as if fully set forth herein.

181.    At all times relevant herein, Defendants were engaged in the business of researching, designing, manufacturing, testing, marketing, distributing, and/or selling PFOA/S and/or AFFF containing PFOA/S. By doing so, Defendants impliedly warranted that their

products were merchantable, safe, and fit for the ordinary purposes for which it was intended to be used.

182.    It was reasonably foreseeable that Defendants' AFFF and/or PFOA/S would be used in the State of Florida.

183.    It was reasonably foreseeable that the Defendants' AFFF and/or PFOA/S products would result in threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources.

184.    Defendants' AFFF and/or PFOA/s products were manufactured for placement into trade or commerce.

185.    As manufacturers and distributors, Defendants owed a duty to all persons whom its products might foreseeably harm, including the State, not to market any product which is unreasonably dangerous in design for its reasonably anticipated use.

186.    By manufacturing and selling AFFF and/or PFOA/S products, Defendants warranted that such products were merchantable, safe, and fit for their ordinary purposes.

187.    Defendants' AFFF and/or PFOA/S products reached the State of Florida without substantial change in their conditions and were used in the State of Florida in a reasonably foreseeable and intended manner.

188.    Defendants' AFFF and/or PFOA/S products were defective and unreasonably dangerous when they left the Defendants' control, entered the stream of commerce, and were received in the State of Florida because they were dangerous to an extent beyond that which would be contemplated by the ordinary user of their products.

189.     Defendants' AFFF and/or PFOA/S products were defective in design because, even when used as intended and directed by Defendants, they can result in threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources.

190.     Defendants' AFFF and/or PFOA/S products did not meet a consumer's reasonable expectation as to their safety because of their propensity to threaten and/or injure drinking water, public health, the environment, property, and the State's natural resources when used as intended.

191.     Defendants failed to develop and make available alternative products that were designed in a safe or safer manner, even though such products were technologically feasible, practical, commercially viable, and marketable at the time the relevant time.

192.     The specific risk of harm—in the form of threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources—from Defendants' products were reasonably foreseeable or discoverable by Defendants.

193.     The design, formulation, manufacture and/or distribution and sale of PFOA/s and/or AFFF containing PFOA/S, which were known to be toxic and extremely mobile and persistent in the environment, was unreasonably dangerous.

194.     Defendants' introduction of AFFF and/or PFOA/S products into the stream of commerce was a proximate cause of damage to the State of Florida requiring investigation, clean-up, abatement, remediation, and monitoring costs and other damages in an amount to be determined at trial.

195.     Defendants are strictly, jointly, and severally liable to the State for all resulting damages, including the costs incurred and to be incurred in responding to the threats and/or injuries to drinking water, public health, the environment, property, and the State's natural

resources from PFOA/S contamination; damages for the public's lost use of the State's natural resources; the costs of assessing the injury to, destruction of, or loss of those natural resources, including the costs of experts to assess the damage; and property damage.

**COUNT THREE**
**Strict Products Liability for Failure to Warn**

196.    The State incorporates by reference the allegations contained in paragraphs 1 through 167 as if fully set forth herein.

197.    The use of AFFF containing PFOA/S in the State of Florida was reasonably foreseeable. Defendants knew or should have known that their AFFF or PFOA/S products threatened and/or injured drinking water, public health, the environment, property, and the State's natural resources when used as intended.

198.    It was foreseeable that the PFOA/S from the AFFF would enter the soil and groundwater and would result in the contamination of property and, potentially, of drinking water supplies that rely upon the groundwater for the source of drinking water.

199.    Defendants had a duty to warn the users of AFFF of these hazards.

200.    Defendants, however, failed to provide adequate warnings of these hazards.

201.    Defendants' failure to issue the proper warning relating to AFFF and/or PFOA/S products affected the market's acceptance of AFFF products containing PFOA/S.

202.    Defendants' failure to issue the proper warning relating to AFFF and/or PFOA/S products prevented the users of the products from treating them differently with respect to use and environmental cleanup.

203.    Defendants' failures to issue the proper warning relating to AFFF and/or PFOA/S products rendered the products unreasonably dangerous.

204.    Defendants' action in placing AFFF and/or PFOA/S products into the stream of commerce was a direct and proximate cause of Florida's damages.

205.    As a direct and proximate result of Defendants' failure to warn, the State has suffered damages—threats to and/or injury of drinking water, public health, the environment, property, and the State's natural resources.

206.    Defendants are strictly, jointly, and severally liable to the State for all resulting damages, including the costs incurred and to be incurred in responding to the threats and/or injuries to drinking water, public health, the environment, property, and the State's natural resources from PFOA/S contamination; damages for the public's lost use of the State's natural resources; the costs of assessing the injury to, destruction of, or loss of those natural resources, including the costs of experts to assess the damage; and property damage.

### COUNT FOUR
### Restitution

207.    The State incorporates by reference the allegations contained in paragraphs 1 through 167 as if fully set forth herein.

208.    The storage and use of AFFF and/or PFOA/S products in Florida has threatened and injured drinking water, public health, the environment, property, and the State's natural resources.

209.    Defendants caused these threats and/or injuries.

210.    Defendants had and continue to have duties to abate these threats and/or injuries.

211.    Defendants have failed to fulfill their duties.

212.    The State has begun discharging Defendants' duties to abate these threats and/or injuries, and absent complete injunctive relief, the State will continue to discharge those duties.

33

213.    By discharging Defendants' duties to abate these threats and/or injuries, the State has conferred a benefit upon Defendants, and absent restitution, Defendants are unjustly enriched.

214.    Defendants are jointly and severally liable to the State for the reasonable value of the benefit conferred upon them by the State.

## COUNT FIVE
### Negligence

215.    The State incorporates by reference the allegations contained in paragraphs 1 through 167 as if fully set forth herein.

216.    Defendants had a duty to the State of Florida to manufacture and/or market, distribute, and sell their AFFF and/or PFOA/S products in a manner that avoided contamination to the environment and harm to those who foreseeably would be injured by their products.

217.    The use of AFFF and PFOA/S products was reasonably foreseeable. Defendants knew or should have known that their products would contaminate soil and groundwater with PFOA/S, creating a significant threat to human health and the environment. Defendants had a duty to prevent the release of PFOA/S in the foreseeable uses of AFFF.

218.    Defendants breached their duties when they negligently manufactured a dangerous product, negligently marketed, distributed, and sold that product, and/or negligently failed to give adequate warning that such products should not have been used in a manner such as to result in the contamination of soil and groundwater.

219.    Defendants further intended that users of AFFF would rely on the negligent marketing, and users of AFFF justifiably did so.

34

220.     In the alternative, Defendants intended that users of AFFF would rely on Defendants' statements that were false, and users of AFFF justifiably did so. Further, Defendants were negligent in obtaining or communicating the information.

221.     As a direct and proximate result of Defendants' breaches of their duties, Defendants caused the State to suffer actual losses, including threatening and/or injuring drinking water, public health, the environment, property, and the State's natural resources.

## COUNT SIX
### Trespass

222.     The State incorporates by reference the allegations contained in paragraphs 1 through 167 as if fully set forth herein.

223.     Defendants knew with substantial certainty at the time of their manufacture and sale of AFFF and/or PFOA/S products that their products were reasonably likely to result in contamination of the State.

224.     Defendants' acts and omissions were substantially certain to and did result in an intrusion of Defendants' products onto the State's land.

225.     As a direct and proximate result of Defendants' acts and omissions, Defendants caused the State to suffer actual losses. Specifically, the State has endured threats and/or injury to its drinking water, public health, the environment, property, and the State's natural resources.

## COUNT SEVEN
### Violation of Florida's Uniform Fraudulent Transfer Act (DuPont)

226.     The State incorporates by reference the allegations contained in paragraphs 1 through 167 as if fully set forth herein.

227.     The State seeks equitable and other relief pursuant to the Florida Uniform Fraudulent Transfer Act ("FUFTA"), Fla. Stat. § 726.101, et seq., against the DuPont defendants.

35

228.     Under the FUFTA, "[a] transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation: (a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or (b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: 1. Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or 2. Intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due." Fla. Stat. § 726.105.

229.     The DuPont defendants have (a) acted with actual intent to hinder, delay, and defraud parties, and/or (b) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and (i) were engaged or were about to engage in a business for which the remaining assets of The Chemours Company were unreasonably small in relation to the business; or (ii) intended to incur, or believed or reasonably should have believed that The Chemours Company would incur debts beyond its ability to pay as they became due.

230.     DuPont engaged in acts in furtherance of a scheme to transfer E.I. du Pont de Nemours and Company's assets out of the reach of parties such as the State that have been damaged as a result of DuPont's conduct, omissions, and actions described in this Complaint.

231.     It is primarily E.I. du Pont de Nemours and Company, rather than The Chemours Company, that for decades manufactured, marketed distributed, and/or sold PFOA/S or AFFF containing PFOA/S with the superior knowledge that they were toxic, mobile, persistent, bioaccumulative, and biomagnifying, and through normal and foreseen use, would injure the State.

36

232.     As a result of the transfer of assets and liabilities described in this Complaint, DuPont has attempted to limit the availability of assets to cover judgments for all of the liability for damages and injuries from the manufacturing, marketing, distribution, and/or sale of PFOA/S or AFFF containing PFOA/S.

233.     At the time of the transfer of its Performance Chemicals Business to The Chemours Company, E.I. du Pont de Nemours and Company had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding DuPont's liability for damages and injuries for the manufacturing, marketing, distribution, and/or sale of PFOA/S or AFFF containing PFOA/S.

234.     DuPont acted without receiving a reasonably equivalent value in exchange for the transfer or obligation, and E.I. du Pont de Nemours and Company believed or reasonably should have believed that The Chemours Company would incur debts beyond The Chemours Company's ability to pay as they became due.

235.     At all times relevant to this action, the claims, judgment and potential judgments against The Chemours Company potentially exceed The Chemours Company's ability to pay.

236.     Pursuant to Fla. Stat. § 726.108, the State seeks avoidance of the transfer of E. I. du Pont de Nemours and Company's liabilities for the claims brought in this Complaint and to hold DuPont liable for any damages or other remedies that may be awarded by the Court or jury under this Complaint.

237.     The State further seeks all other rights and remedies that may be available to it under FUFTA, including pre-judgment remedies as available under applicable law, as may be necessary to fully compensate the State for the damages and injuries it has suffered as alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of Florida prays for the following relief:

a.      The acts described herein be adjudged unlawful;

b.      Defendants be enjoined to fund the State's investigation of, and remediation efforts related to contamination statewide or to perform those activities themselves;

c.      Plaintiff recover all measures of damages for injuries to, destruction of, or loss of the State's natural resources;

d.      Plaintiff recover restitution on behalf of Florida agencies;

e.      Plaintiff recover its attorneys' fees, costs of investigation, and other costs as provided by law;

f.      An order abating the public nuisance created and maintained by Defendants and ordering any injunctive relief that the Court finds appropriate under law; and

g.      An order ordering such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted this 6th day of December, 2022.

**ASHLEY MOODY**
**Attorney General**

*/s/ Andrew H. Butler*

John Guard (FBN #374600)
Chief Deputy Attorney General
John.Guard@myfloridalegal.com

R. Scott Palmer (FBN #220353)
Chief of Complex Enforcement
Scott.Palmer@myfloridalegal.com

38

Gregory S. Slemp (FBN #478865)
Special Counsel for Litigation
Greg.Slemp@myfloridalegal.com

Andrew H. Butler (FBN #123507)
Assistant Attorney General
Andrew.Butler@myfloridalegal.com

Christopher A. Knight (FBN #1022342)
Assistant Attorney General
Christopher.Knight@myfloridalegal.com

Department of Legal Affairs
PL-01, The Capitol
Tallahassee, Florida 32399-1050
Telephone: (850) 414-3300
Counsel for State of Florida